# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| *In re*: | ) | Case No. 09-73997-FJS |
| | ) | |
| STEPHEN RAY OWENS, | ) | |
| | ) | |
| *Debtor*. | ) | |
| | ) | |
| DAVID C. REED, | ) | APN 09-7142-FJS |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN RAY OWENS, | ) | |
| | ) | |
| *Defendant*. | ) | Chapter 13 |

## MEMORANDUM OPINION

This matter comes before the Court upon trial of the above-mentioned Adversary Proceeding. The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. § 1409(a). Upon consideration of the pleadings, the evidence presented at trial, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

The damages suffered by Plaintiff were the direct and proximate result of Defendant's

1

conduct—Defendant interjected himself voluntarily and willfully into a quarrel between persons

with whom he had no relationship and to whom he owed no obligation whatsoever to protect.

The resulting injuries suffered by Plaintiff were inflicted willfully and maliciously, as more fully

discussed below.  Accordingly, the Court concludes that Plaintiff has proved by a preponderance

of the evidence that Defendant acted willfully and maliciously by injuring Plaintiff, such that the

debt owed to Plaintiff by Defendant shall not be discharged in the Defendant's Chapter 13

bankruptcy case pursuant to 11 U.S.C. § 523(a)(6) and to 11 U.S.C. § 1328(a)(4).[1]

## I. BACKGROUND

### A. The Debtors' Chapter 13 Case

On September 28, 2009, Stephen R. Owens (the "Debtor", "Defendant", or "Owens")

filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code (the

"Code"). (Case No. 09-73997-FJS; Doc. No. 1.)  The Debtor filed his Summary of Schedules

and corresponding Schedules on October 13, 2009.  (Case No. 09-73997-FJS; Doc. No. 10.)

Schedule F—Creditors Holding Unsecured Nonpriority Claims—lists a claim filed by William

C. Bischoff, Esq., on behalf of David C. Reed (the "Plaintiff" or "Reed"), with a value of

$100,000.00 for a judgment rendered on March 12, 2007.  (Case No. 09-73997-FJS; Doc. No. 10

at 13.)  Defendant filed his first Chapter 13 Plan on October 13, 2009.  (Case No. 09-73997-FJS;

Doc. No. 11.)  Defendant filed an Amended Chapter 13 Plan on November 30, 2009, which was

---

[1] "Subject to subsection (d) . . . the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt— . . . (4) for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual." 11 U.S.C. § 1328(a)(4) (2006). The Court notes that the law developed in the context of § 523(a)(6) is applicable to the Chapter 13 context so long as the injury complained of is *personal* injury. *See generally In re Nwoke*, No. 07-10324-SSM, 2008 WL 750591 (Bankr. E.D. Va. March 18, 2008) (noting that the distinction between § 523(a)(6) and § 1328(a)(4) is that Congress intended § 1328(a)(4) to extend only to damages arising out of personal injury, not to property); *see also Waag v. Permann (In re Waag)*, 418 B.R. 373, 375-76 n.4 (B.A.P. 9th Cir. 2009) ("Debts excepted from discharge under section 523(a) may be discharged in chapter 13 unless expressly excluded from discharge in section 1328(a)(2).").

confirmed by Order of the Court on January 11, 2010. (Case No. 09-73997-FJS; Doc. Nos. 14,

24.) The Chapter 13 Plan proposes to pay a 1% dividend to allowed nonpriority unsecured

claims, encompassing Plaintiff's judgment. (Case No. 09-73997-FJS; Doc. No. 14 at 3.)

### B. The State Court Action

On May 20, 2005, Plaintiff filed a Motion for Judgment (the "Motion for Judgment") in

the Circuit Court for the City of Newport News, Virginia against Defendant, Jeff R. Honard,

Joannie J. Bell, Tim Giles, Leonard Harris, Taylor's Family Restaurant & Lounge, t/a T.G.'s

Steakhouse & Saloon, Ivy Farms Shopping Center, and Ivy Holdings LLC (collectively, the

"defendants").[2] (State Court Case No. CL04-38832.) The Motion for Judgment alleged that the

defendants were liable, jointly and severally, for damages in the amount of $150,000.00,

resulting from an altercation on October 5, 2002. (Motion for Judgment at 1-2.) The Motion for

Judgment alleged that the defendant's negligence and intentional torts caused Plaintiff's injuries.

A brief summary of the Motion for Judgment follows. After a dispute with a waitress,

Joannie J. Bell ("Bell"), inside T.G.'s Steakhouse and Saloon ("T.G.'s"), Plaintiff left T.G.'s.

Then, Defendant, and Jeff Honard ("Honard") and Bell—who were boyfriend and girlfriend at

the time—allegedly assaulted Plaintiff and his companion, Betty F. Fluet ("Fluet"). Defendant,

Honard, and Bell, allegedly struck Plaintiff in the parking lot of T.G.'s. Plaintiff suffered

injuries to his eyes, head, face, back, and neck, as well as internal injuries. (Motion for

Judgment ¶¶ 5-13.)

On March 12, 2007, the Circuit Court for the City of Newport News, Virginia issued a

---

[2] The Court at trial admitted the Certified Order of the Circuit Court for Newport News (the "Judgment Order").
(Pl.'s Ex. 3.) Further, Plaintiff's Adversary Complaint attaches three state court documents filed in the case of *Reed
v. Owens, et al.*, Case No. CL04-38832 (AF), before the Circuit for the City of Newport, News, Virginia: (1) Motion
for Judgment; (2) Judgment Order; and (3) Certification of Official Record. The Court takes judicial notice that

final Order (the "Judgment Order") in the case of *David C. Reed v. Jeff R. Honard, Joannie J. Bell, and Steve R. Owens.* (Pl.'s Ex. 3.) The Judgment Order awarded Plaintiff $100,000.00, plus interest and costs. The Judgment Order states that the defendants offered no defense and did not respond to the Motion for Judgment, and the Circuit Court for the City of Newport News decided the matter without a jury. (Pl.'s Ex. 3.) The Judgment Order is final.

## II. PROCEDURAL HISTORY

On December 15, 2009, Plaintiff filed the instant action against Defendant (the "Complaint"), seeking a determination of nondischargeability of the debt that arose out of the Judgment Order and its underlying circumstances. (APN 09-07142-FJS, Doc. No. 1.) The Complaint avers that pursuant to §§ 523(a)(6) and 1328(a)(4) of the Code, the debt owed to Plaintiff is nondischargeable in Defendant's Chapter 13 case. (Compl. ¶¶ 8-9.)

On January 12, 2010, Defendant filed an Answer to the Complaint (the "Answer"). (APN 09-07142-FJS, Doc. No. 5.) In the Answer, Defendant (1) asserted that the Judgment Order "has not been appropriately litigated"; (2) asserted that "the judgment obtained by the Plaintiff was by default"; and (3) denied that §§ 523(a)(6) and 1328(a)(4) applied to the instant matter. (Answer ¶¶ 2-4.)

### A. Deposition Testimony

On May 13, 2010, counsel for Defendant deposed Plaintiff. (Def.'s Ex. A.) Also on May 13, 2010 counsel for Plaintiff deposed Defendant. (Pl.'s Ex. 4.) Prior to trial, the parties stipulated that a portion of Defendant's deposition transcript not be admitted into evidence. The Court accepted this stipulation at trial. (APN 09-07142-FJS, Doc. No. 17, Stip. of Facts at 1;

---

these state court documents are official documents of the Circuit Court of Newport News, Virginia. (APN 09-07142-FJS, Doc. No. 1 at 8-18.)

APN 09-07142-FJS, Doc. No. 19, hereinafter "Trial Tr.", at 7:20-8:6.)[3] At Trial, the Court

admitted the deposition transcripts into evidence, except the portion of Defendant's deposition

testimony excluded by stipulation.

### 1. Plaintiff's Deposition Testimony

The following recitation of facts and events is as Plaintiff recalled them during his

deposition testimony. Plaintiff and Fluet arrived at T.G.'s between 9:00 and 9:30 PM on the

night of October 5, 2002. (Def.'s Ex. A at 9:24-10:1.) Plaintiff drank four Canadian Mists and

ginger ale over the course of three and one-half hours at T.G.'s, while Fluet drank two beers.

(Def.'s Ex. A at 10:16-11:4.) Plaintiff was unhappy with the service that Bell provided on

October 5, 2002, as well as past occasions. (Def.'s Ex. A at 13:5-17.) When Plaintiff, Fluet, and

a friend left their table at about 1:30 AM on October 6, 2002, they approached and began to enter

Plaintiff's car. Fluet was planning to drive Plaintiff's car. (Def.'s Ex. A at 16:8-25.)

Next, while Plaintiff and Fluet were not yet inside his car, Bell and Honard exited T.G.'s

and walked into the parking lot. Bell was upset and screamed "____ this place." (Def.'s Ex. A

at 17:16-19.) Bell approached Plaintiff's car and threw her purse on the rear exterior of

Plaintiff's car. Plaintiff asked that Bell remove her purse. (Def.'s Ex. A at 18:13-24.) Next,

Honard approached Plaintiff and punched Plaintiff without warning. (Def.'s Ex. A at 19:16-25.)

While Honard struck Plaintiff near or in the passenger doorway to Plaintiff's car, Plaintiff

reached inside his car to retrieve his cell phone. (Def.'s Ex. A at 20:1-4.) Plaintiff struck

Honard with a fist—Plaintiff could not recall whether it was the fist in which he held his cell

phone or an empty fist. (Def.'s Ex. A at 20:21-23.) Soon, Honard had backed off about ten to

fifteen yards, but Fluet and Bell were engaged with each other at this point. (Def.'s Ex. A at

---

[3] Page 27, Line 14 through Page 31, Line 10 of Defendant's deposition transcript is not admitted into evidence.

22:3-5.) Plaintiff then pushed apart Bell and Fluet. (Def.'s Ex. A at 22:15-17.)

Plaintiff pushed apart Bell and Fluet by placing his hands on their chest and neck area. Immediately after Plaintiff separated the two women, Defendant tackled Plaintiff. (Def.'s Ex. A at 35:20-36:6.) Counsel for Defendant asked Plaintiff if, next, Plaintiff heard a bystander "shout[] anything to the effect that you had a weapon or a gun or anything like that?" Plaintiff responded that, no, he did not hear any shouts to that effect. (Def.'s Ex. A at 36:7-10.)

Defendant tackled Plaintiff from behind and pushed Plaintiff to the ground without warning. Defendant kicked Plaintiff in the face, back, and stomach. (Def.'s Ex. A at 23:21-25.) For several minutes, Defendant held him to the ground, and Defendant struck Plaintiff in the face and kicked Plaintiff. Then, Plaintiff bit Defendant in the lower extremities. (Def.'s Ex. A at 24:13-24.) Plaintiff rose from the ground and then Defendant hit Plaintiff in the face and pushed Plaintiff back down near a fence. (Def.'s Ex. A at 26:11-25.) Ultimately, a friend of Plaintiff's and Fluet's pulled Defendant away from Plaintiff and a T.G.'s security guard arrived and the altercation ended. (Def.'s Ex. A at 28:1-3.) On October 7, 2002, Plaintiff noticed blood in his urine. Plaintiff recalled that he was diagnosed with bruised kidneys, broken blood vessels in the eye, lacerated face, and lacerated elbows and knees. (Def.'s Ex. A at 29:21-30:1.)

**2. Defendant's Deposition Testimony**

The following recitation of facts and events is as Defendant recalled them during his deposition testimony. Defendant and his then-live-in-girlfriend, Julie Ann Boyd ("Boyd"), arrived at T.G.'s at about 9:00 PM on October 5, 2002. (Pl.'s Ex. 4 at 15:3.) Defendant and Boyd sat at a table with Boyd's sister and Boyd's brother-in-law. (Pl.'s Ex. 4 at 16:9.) Defendant had no contact or conversations with Bell and could not recall whether Bell served his table or not. (Pl.'s Ex. 4 at 17:23-18:5, 20:21-25.) Defendant had no contact with Plaintiff

inside T.G.'s and did not notice Plaintiff inside T.G.'s. (Pl.'s Ex. 4 at 22:21-23:7.)

Between 12:00 AM and 12:30 AM, Defendant, Boyd, and their friends exited T.G.'s.

(Pl.'s Ex. 4 at 22:14-18.) Upon stepping outside T.G.'s, Defendant viewed Honard "with his

*hands up in the air walking backwards with [] Reed walking towards [Honard]." (Pl.'s Ex. 4 at*

23:13-14.) Next, a bystander in a crowd of people surrounding Honard, Plaintiff, Bell, and Fluet

yelled out, "He has a gun," referring to Plaintiff. (Pl.'s Ex. 4 at 23:19.) Plaintiff turned towards

Bell and struck Bell "with a black object in the head. She falls to the concrete." (Pl.'s Ex. 4 at

23:24-25.) Blood was running out of Bell's head. (Pl.'s Ex. 4 at 24:1.)

Defendant ran to help Bell, and at that point, Plaintiff struck Defendant in the ribs with

the black object. (Pl.'s Ex. 4 at 24:3.) Defendant then engaged Plaintiff:

> Then I went after him. I went and picked him up -- I went after him into the
> fence. And at that time, you know we were fighting and he was down on the
> ground. He got up, he bit me in my stomach, and I hit me twice in the side of the
> head. He fell to the ground. He continued to get up, and then I kicked him.

(Pl.'s Ex. 4 at 24:3-9.) Defendant did not recall a security guard arriving on the scene in the

parking lot. (Pl.'s Ex. 4 at 24:2.) A Newport News police officer arrived and the crowd and the

participants in the altercation dispersed. (Pl.'s Ex. 4 at 27:4-8.) Defendant and Boyd left in

Defendant's truck after standing around for ten minutes. (Pl.'s Ex. 4 at 27:10-13.)

### B. Trial

At trial, on June 16, 2010, Plaintiff and Fluet each testified on behalf of Plaintiff, and

Defendant and Julie Boyd ("Boyd") each testified on behalf of Defendant. (APN 09-07142-FJS,

Doc. Nos. 18, 19.)

### 1. Fluet's Testimony

The following recitation of facts and events is as Fluet recalled them at trial. Fluet and

Plaintiff were dating in October 2002 and remain girlfriend and boyfriend as of the date of trial.

7

(Trial Tr. at 17:7-14.)  Fluet and Plaintiff arrived at T.G.'s between 9:00 PM and 9:30 PM on

October 5, 2002.  (Trial Tr. 17:22-23.)  Fluet imbibed a "couple beer[s]", and Plaintiff "had three

or four drinks, mixed drinks."  (Trial Tr. 18:14-15.)  During the course of the evening, the

manner in which Plaintiff ordered his drinks upset Bell.  Plaintiff opted not to order drinks from

Bell but instead left his seat at a table in Bell's section of T.G.'s and ordered directly from the

bartender.  (Trial Tr. 18:22-19:10.)

At about 1:00 AM, Fluet and Plaintiff exited T.G.'s after Plaintiff spoke with the

manager of T.G.'s regarding Bell  (Trial Tr. 18:18; 19:10.)  While Plaintiff and Fluet

approached Plaintiff's vehicle in the parking lot, Bell and Honard exited T.G.'s, and Bell was

visibly angry.  (Trial Tr. 20:10-14.)  Bell, accompanied by Honard, confronted Fluet and

Plaintiff; Bell placed her purse atop Plaintiff's car.  (Trial Tr. 20:19.)  Honard approached

Plaintiff, and Bell approached Fluet.  Then, without warning, Honard punched Plaintiff in the

face.  (Trial Tr. 21:1-18.)  As Fluet attempted to help Defendant, Bell "karate kicked [Fluet] in

the stomach" and the two women became "tangled up."  (Trial Tr. 21:11-14.)  While Fluet and

Bell were engaged with one another, Plaintiff pushed Fluet and Bell apart.  (Trial Tr. 21:15.)

Plaintiff pushed the two women apart with his hands on each of their chests.  (Trial Tr. 31:8-13.)

Fluet struck Bell with her shoe, and Defendant "jumped [Plaintiff] from behind."  (Trial Tr. 30:8-

10.)

Plaintiff was "grabbed [] around the neck from behind" by Defendant, and Defendant

"was punching [Plaintiff] in the face.  And then [Defendant] and [Honard] had [Plaintiff] down

kicking him."  (Trial Tr. 21:16-18.)  Plaintiff struck Defendant with either his fist or his cell

phone.  (Trial Tr. 29:14-15.)  Fluet, next, returned to the inside of T.G.'s to ask a companion to

help Plaintiff fend off Defendant and Honard.  When the companion and Fluet returned to the

8

parking lot, Defendant was still kicking Plaintiff against a fence. When police arrived on the scene, the parties dispersed. (Trial Tr. 22:13-23.)

## 2. Plaintiff's Testimony

The following recitation of facts and events is as Plaintiff recalled them at trial. Prior to the night of October 6, 2002, Plaintiff had no contact with Defendant. (Trial Tr. 35:10-20.) Plaintiff spoke with a manager of T.G.'s regarding Bell's unwillingness to wait on his table, and Plaintiff stated that "they needed to do something about this situation with the waitress or I was just going to stop coming there." (Trial Tr. 36:23-25.) Prior to leaving at 1:00 AM on October 6, 2002, Plaintiff turned over his ashtray, dumping its contents on the table. (Trial Tr. 37:7-13.)

While Plaintiff and Fluet stood just outside the passenger-side door of Plaintiff's car, Bell and Honard approached the car. Bell tossed her purse onto Plaintiff's car, at which point Plaintiff asked Bell to remove the purse. To which Bell responded, "you scared you're going to get blood on it." (Trial Tr. 42:3-4.) Honard then punched Plaintiff. (Trial Tr. 42:10.) Plaintiff then reached into his car to retrieve his cell phone. Plaintiff's cell phone was larger than current models and was approximately six inches long. (Trial Tr. 42:17.) Plaintiff was able to repel Honard, while Fluet and Bell continued to struggle with each other. (Trial Tr. 43:2-12.) Plaintiff pushed each woman's chest, separating them,[4] and "within a split second it's like they were on me," referring to Defendant. (Trial Tr. 46:16-17.)

Defendant "knocked [him] to the ground" and Plaintiff was "being held by [his] head and hair and just being repeatedly kicked, pushed in the face, kicked in the stomach, repeatedly kicked in the perineum of [his] body" by Defendant. (Trial Tr. 46:21-47:5.) Plaintiff, when he

---

[4] On cross-examination, Plaintiff testified that—while he did push Bell in the neck and chest area—he did *not* push Bell to the ground when he broke up the fight between Bell and Fluet. (Trial Tr. 60:5.)

9

was on his knees, grabbed Defendant and bit Defendant. (Trial Tr. 47:4-5.) Defendant then

stopped kicking Plaintiff's back and, instead, began to strike Plaintiff with his fist from above.

(Trial Tr. 47:24-48:2.) Next, Plaintiff's friend pulled Defendant off of Plaintiff, and a T.G.'s

security guard arrived on the scene. (Trial Tr. 48:7-14.) Ultimately, police arrived on the scene.

(Trial Tr. 48:14-15.)

### 3. Boyd's Testimony

The Defense called Boyd as its first witness. (Trial Tr. 64:7.) The following recitation of

facts and events is as Boyd recalled them at trial. As of October 2002, Boyd and Defendant had

been dating approximately one month. (Trial Tr. 64:22-24.) Boyd sat at a table inside T.G.'s

with Defendant, Boyd's sister, and Boyd's sister's husband. (Trial Tr. 66:4-7.) Boyd observed

Plaintiff order drinks directly from the bartender, rather than from Bell, and that Plaintiff turned

an ashtray upside-down on the table prior to leaving T.G.'s. (Trial Tr. 67:9-15.) Boyd and

Defendant left T.G.'s between 1:30 AM and 2:00 AM on October 6, 2002. (Trial Tr. 67:18-25.)

Upon entering the parking lot, Boyd viewed Fluet, who "was slinging [her purse] like a

helicopter propeller" at Bell. (Trial Tr. 68:19-20.) Plaintiff struck Bell "which made her fall on

her back." (Trial Tr. 69:2-3.) After Plaintiff struck Bell, Defendant "ran over" to face Plaintiff.

(Trial Tr. 69:16-17.) Defendant did not approach Plaintiff from behind. (Trial Tr. 69:20-21.)

Further, a crowd had gathered by this point. (Trial Tr. 70:12-13.) Boyd was asked, on direct

examination, whether she heard a member of the crowd shout anything memorable that night,

and she responded in the negative. (Trial Tr. 72:24-73:4.)

Boyd characterized the exchange between Plaintiff and Defendant as "a fight", "not a

malicious beat-down." (Trial Tr. 70:17-22.) "[B]oth parties are swinging." (Trial Tr. 70:19.)

Defendant held Plaintiff to the ground, according to Boyd's testimony on cross-examination.

10

(Trial Tr. 75:13-16.) Four people—Plaintiff and Defendant and Honard and "a biker guy"—were involved in the fight. (Trial Tr. 73:12-23.) Boyd and Defendant are no longer dating. (Trial Tr. 74:5-10.) At the conclusion of her testimony, Boyd stated that she "would like the outcome to be good for the victim here which [she] think[s] is Steve [Owens] at this point." (Trial Tr. 74:19-20.)

### 4. Defendant's Testimony

The following recitation of facts and events is as Defendant recalled them at trial. Defendant and Boyd arrived at T.G.'s around 9:00 PM on October 5, 2002. (Trial Tr. 78:16.) Over the course of the night, Defendant consumed two margaritas. (Trial Tr. 78:14.) Defendant had never seen Plaintiff or Fluet before October 5, 2002 and did not recall seeing Plaintiff inside T.G.'s. (Trial Tr. 77:25-26; 78:20-24.) Defendant had only met Bell—the waitress—once prior to October 5, 2002. (Trial Tr. 78:2-11.) Defendant described his relationship with Bell as "just a one-time thing." (Trial. Tr. 78:9.) Upon entering the parking lot outside T.G.'s he viewed Honard slowly walking backwards while the Plaintiff, holding a black object, approached Honard. (Trial Tr. 79:13-19.) Cross-examination of Defendant revealed that Defendant arrived in the parking lot after the altercation between Plaintiff and Bell and Honard had already begun, and Defendant was unaware of the cause of their argument. (Trial Tr. 89:1-6.)

When Defendant and his party entered the parking lot, there were "a lot of people outside."[5] (Trial Tr. 79:14.) Defendant heard "a life-threatening scream that came out of the crowd." (Trial Tr. 81:11.) "Someone shouted out that he had a gun." (Trial Tr. 87:21.) Defendant believed that Plaintiff "was going to use that object that he had in his hand." (Trial

---

[5] On cross-examination of Plaintiff, Plaintiff stated that he was not aware that a crowd had gathered. (Trial Tr. 62:16-22.)

Tr. 81:19-20.) Defendant could not determine on his own what that black object was; "just a medium size black, hard object." (Trial Tr. 85:22-23.) Plaintiff turned towards Bell and struck her on the top of her head with the black object he held in his hand. (Trial Tr. 82:3-6.) Bell, then, fell "to the concrete on the sidewalk and blood [was] gushing out of her head." (Trial Tr. 82:5-6.)

Defendant ran to help Bell. Before Defendant could reach Bell, however, Plaintiff swung the black object at Defendant, striking Defendant in the ribs. (Trial Tr. 82:11-16.) Plaintiff then stepped back about six feet away from Defendant. (Trial Tr. 84:10-12.) Defendant, then, engaged Plaintiff; Defendant "charged at him and [] lifted him up and took him to the ground." (Trial Tr. 84:12-13.) When Plaintiff was on his knees, Plaintiff bit Defendant in the stomach; Defendant then "hit him in the head, one time in the head, and he fell to the ground." (Trial Tr. 84:16-19.) Up to this point, Honard had not re-engaged Plaintiff. (Trial Tr. 84:20-25.)

Defendant struck Plaintiff, knocking him down. At which point, Plaintiff struck Defendant in the side. (Trial Tr. 85:4-5.) Defendant then "kicked him two times, and he fell to the ground." (Trial Tr. 85:5-6.) Honard "came over to David Reed and began kicking him on the ground." (Trial Tr. 85:9-10.) Defendant backed off and removed himself from the fight, on his own volition. (Trial Tr. 10-12.)

### III. FINDINGS OF FACT

Based on the record and evidence, the Court makes the following findings of fact regarding the events of October 5, 2002 and early October 6, 2002. The Court notes, however, that the lone witness at trial who was neither a party to this adversary proceeding nor *currently* dating a party to the proceeding was the former girlfriend of Defendant—Ms. Boyd. Boyd concluded her testimony at trial with the statement that she "would like the outcome to be good

for the victim here which I think is [Defendant] Steve [Owens] at this point"—hardly the words

of a disinterested witness. (Trial Tr. 74:19-20.) The Court lacks the benefit of a developed

factual record from the state court because that court entered its judgment without a response

from any of the defendants. (Pl.'s Ex. 3.) Accordingly, the Court must weigh the credibility of

the witnesses, while taking into account their recollection of events nearly eight years prior to

trial.

      Between 9:00 PM and 9:30 PM on the October 5, 2002, Plaintiff and his girlfriend, Fluet,

arrived at T.G.'s and sat at a table in the section of T.G.'s served by Bell. Rather than order

directly their drinks from Bell, Plaintiff chose to order his and Fluet's drinks by leaving the table,

walking to the bar, and ordering with the bartender. This practice irritated Bell because—the

only logical conclusion that the Court can draw—this reduced Bell's receipt of gratuity and tips

from Plaintiff's table, was disrespectful and may have placed Bell's job in jeopardy. Plaintiff, in

the past, had refused to order drinks with Bell, opting instead to place orders with the bartender.

This practice was a direct and blatant insult to Bell, as was dumping upside-down the ashtray on

Bell's table.

      At about 9:30 PM on October 5, 2002, Defendant and his then-live-in-girlfriend, Boyd,

arrived at T.G.'s, accompanied by Boyd's sister and brother-in-law. That group sat in a table in

or near the section served by Bell. Defendant consumed two margaritas during the evening. No

meaningful relationship existed between Defendant and Bell, as the two had only met on one

prior occasion.

      At about 1:15 AM on October 6, 2002, Plaintiff and Fluet chose to leave T.G.'s. Before

leaving, however, Plaintiff spoke with the bartender-manager of T.G.'s and complained about the

service offered by Bell. Plaintiff offered the ultimatum that T.G.'s either address—in Plaintiff's

opinion—Bell's poor service or Plaintiff would stop patronizing T.G.'s. Plaintiff dumped the

contents of the ashtray from his and Fluet's table upside down onto the face of the table, before

leaving T.G.'s.

Plaintiff and Fluet approached Plaintiff's car in the parking lot outside T.G.'s. Due to

Plaintiff's consumption of alcohol, and the fact that Fluet had consumed less alcohol, Fluet

planned to operate Plaintiff's car. When both Plaintiff and Fluet were on the passenger side of

the car and the passenger side door was open, but before getting inside the car to leave, Bell and

Honard approached Plaintiff and Fluet. Bell was angry with Plaintiff as a result of his

unwillingness to order from Bell, his conversation with the manager of T.G.'s, and his act of

dumping out an ashtray at a table in Bell's section. Bell placed her purse on Plaintiff's car

against Plaintiff's wishes. Bell approached Fluet, and the two women physically engaged with

one another. While Fluet and Bell were engaged with one another, Honard had already struck

Plaintiff, and they physically engaged with each other. Plaintiff was able to fend off Honard

while Plaintiff reached inside his car to retrieve his cell phone. Plaintiff struck Honard with a fist

and the two men separated from one another, while Fluet and Bell continued to struggle with

each other.

At this time, approximately 1:30 AM, Defendant and Boyd stepped outside T.G.'s into

the parking lot. Defendant—without any knowledge of how and why the struggle between

Plaintiff, Honard, Bell, and Fluet had begun—viewed Plaintiff and Honard stepping away from

each other, while Fluet and Bell still struggled with each other. Plaintiff pushed both women on

their chest and neck area to separate them. In Defendant's subjective view—which is

unsubstantiated by any credible evidence in the record—a crowd had gathered around Plaintiff,

Honard, Bell, and Fluet. Furthermore, Defendant claims that a member of that crowd called out

14

that Plaintiff possessed a gun.  There is no credible evidence that Plaintiff possessed a gun.  The Court finds, as a finding of fact, that there was no gun involved in this matter.

Upon viewing Honard backing away from Plaintiff and Plaintiff using force to separate Bell and Fluet, Defendant rushed and tackled Plaintiff into a fence.  Defendant acted without provocation or justification of any kind.  If Defendant had tended to his own business, then he would not face the problem presented here.  In other words, Defendant inserted himself into a situation that he had nothing to do with.

As Defendant came into contact with Plaintiff, Plaintiff retaliated by swinging his fist that held the cell phone into Defendant's ribs.  Both Defendant and Plaintiff went to the ground. Defendant was able to rise back up, while Plaintiff still lay on the ground.  Plaintiff, rising to his knees, bit Defendant in his abdomen in retaliation.  Defendant reacted by punching and striking the Plaintiff twice on Plaintiff's head.  Plaintiff then fell back to the ground.  At this point, Defendant had a clear and obvious opportunity to retreat and refrain from continuing to strike or kick Plaintiff because Plaintiff was neutralized on the ground.  The Court finds as a finding of fact that Defendant had subdued Plaintiff.  Assuming *arguendo* that Plaintiff had ever posed a credible threat to the safety of Honard, Bell, or Defendant, Defendant's actions up to this point in time rendered any such threat nonexistent.  In other words, if Plaintiff had possessed a gun— which the Court finds he did not—knocking Plaintiff to the ground without evidence of a weapon should have been sufficient to end the engagement.  Instead, Defendant pressed on. Defendant kicked Plaintiff at least twice when Plaintiff attempted to get up off the ground, injuring Plaintiff.  Plaintiff fell back to the ground, and, finally, the altercation subsided.  The parties ultimately dispersed when authorities and security employed by T.G.'s arrived in the parking lot.

15

## IV. ANALYSIS

Based on its findings of fact, the Court must apply those findings to the legal standard of

the Fourth Circuit and the Bankruptcy Code. The crux of the Court's analysis rests on the fact

that Defendant interjected himself voluntarily and willfully into an ongoing dispute among

persons with whom he had no prior relationship and that Defendant sought to protect individuals

to whom he owed no duty of protection. Furthermore, even if Defendant held the subjective

belief that he was protecting Honard and Fluet, then Defendant's repeated and continuous assault

of Plaintiff, in light of a chance to retreat, can only be deemed willful and malicious.

### A. The State Court Judgment Does Not Bind The Court

The Court must determine whether the judgment rendered by the Circuit Court for the

City of Newport News has a preclusive effect on this case. "Bankruptcy courts frequently apply

the doctrine of issue preclusion in dischargeability proceedings." *Hernandez v. Greene* (*In re

Greene*), 397 B.R. 688, 693-94 (Bankr. S.D.N.Y. 2008) (citing *Grogan v. Garner*, 498 U.S. 279,

284 (1991)). "When a prior judgment has been rendered in a State court, its preclusive effect in

a federal proceeding depends on the law of the State that rendered the judgment." *In re Greene*,

397 B.R. at 694 (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75 (1984)); *see

also Pahlavi v. Ansari* (*In re Ansari*), 113 F.3d 17, 18 (4th Cir. 1997). Therefore, the Court

looks to the law of the Commonwealth of Virginia to determine whether the default judgment

would be afforded preclusive effect.

"For the doctrine [of collateral estoppel] to apply, the parties to the two proceedings, or

their privies, must be the same; the factual issue sought to be litigated actually must have been

litigated in the prior action and must have been essential to the prior judgment; and the prior

action must have resulted in a valid, final judgment against the party sought to be precluded in

16

the present action." *Prunty v. Terry* (*In re Paschall*), 408 B.R. 79, 87-88 (E.D. Va. 2009)

(quoting *TransDulles Ctr., Inc. v. Sharma*, 252 Va. 20, 22-23 (Va. 1996)). There are five

elements needed to apply collateral estoppel:

> First, the issue litigated must have been essential to the prior judgment. Second,
> the prior action must have resulted in a valid and final judgment against the party
> sought to be precluded in the present action. Third, the parties or privies in both
> proceedings must be the same. Fourth, there must be mutuality between the
> parties. Finally, the factual issue litigated actually must have been litigated in the
> prior action.

*E.L. Hamm & Assocs., Inc. v. Sparrow* (*In re Sparrow*), 306 B.R. 812, 825 (Bankr. E.D. Va.

2003) (citing *TransDulles*, 252 Va. at 20-23) (internal citations omitted).

In *TransDulles*, the Supreme Court of Virginia held that "Virginia law does not support a

blanket exemption from the application of collateral estoppel in the case of a default judgment."

*TransDulles*, 252 Va. at 23.[6]  In light of the entry of a default judgment in the first court, the

second court hearing the issue may then apply collateral estoppel against the party against whom

the default judgment was entered, deeming the issue to have been actually litigated.

The analysis, however, does not end when—in the subsequent action—that court is

presented with evidence of a default judgment in the prior action. In *TransDulles*, the Supreme

Court of Virginia gave great weight to the fact that, while the defendant in the first action failed

to appear personally or by counsel at a dispositive hearing, the court received evidence.

> Testimonial and documentary evidence was presented *ex parte* in the district court
> hearing. The circuit court record established that proof was presented in the
> district court through a bookkeeper for the [plaintiff] . . . and through the
> [plaintiff's] attorney, who presented lease and other documents including an
> affidavit supporting the attorney's fees claimed.

---

[6] The Commonwealth of Virginia is in the minority of jurisdictions because its courts may afford a preclusive effect
to default judgments. *See, e.g., Spilman v. Harley*, 656 F.2d 224 (6th Cir. 1991); *In re Ross*, 602 F.2d 604 (3d Cir.
1979); *Stokes v. Vierra*, 185 B.R. 341 (N.D. Cal. 1995); *Bay Area Factors v. Calvert* (*In re Calvert*), 177 B.R. 583
(Bankr. W.D. Tenn. 1995).

*TransDulles*, 252 Va. at 24.   The Supreme Court of Virginia denied the defendant's contention

that he must have personally appeared at the hearing to contest the issue in order for collateral

estoppel to apply. *Id.*

The Fourth Circuit Court of Appeals later applied the *TransDulles* decision. *Pahlavi*, 113

F.3d at 20-21. *Pahlavi* relied heavily on *TransDulles*; the defendant lost a state court action

awarding compensatory and punitive damages to the plaintiff after the defendant abused the state

court's discovery process and his "dilatory tactics stalled any accounting." *Pahalvi*, at 18. The

state "court ordered that all of the allegations in [plaintiff's] complaint be taken as true," as a

result of the discovery abuses. *Id.* A month after the state court's default judgment, the

defendant filed for Chapter 7 protection, and the plaintiff filed a § 523(a)(4) adversary complaint

alleging that the damages awarded in the state court action were a nondischargeable debt. *Id.* at

19. The creditor-plaintiff relied on collateral estoppel principles to support his allegation of

nondischargeability; the bankruptcy court and the district court agreed. The debtor-defendant

argued before the Fourth Circuit that the lower courts should not to have applied collateral

estoppel because the state court decision was a default judgment. *Id.* The Fourth Circuit looked

closely at the *TransDulles* decision in determining whether to preclude the defendant-debtor

from raising a defense to the plaintiff-creditor's § 523(a)(4) claim. *Id.* at 20. The Fourth Circuit

concluded that the default judgment in the state court action did not prevent application of

collateral estoppel:

> [M]ultiple depositions were taken, many documents exchanged and the court . . .
> held numerous hearings in which [defendant-debtor] appeared in person or by
> counsel . . . . In sum, there was much more evidence before the state court in this
> case than in *TransDulles*, and the parties here certainly engaged in more extensive
> and two-sided litigation of the relevant issues.

*Id.* at 21. Therefore, in determining whether to apply collateral estoppel in the face of a state

court's default judgment, in the § 523(a) nondischargeability context, bankruptcy courts must look to the actions of the parties prior to entry of that default judgment.

The matter before the Court, however, stands in stark contrast to the proceedings discussed in *Pahlavi*. In *Pahlavi*, the parties engaged in discovery and adduced evidence that was brought into the trial court's record. Each party participated in the discovery process; the defendant was aware of the factual issues for which the plaintiff was searching and, in turn, could not disclaim actually litigating the issue after attending hearings, producing documents, and examining and producing deposition witnesses.

There is no evidence in the record before the Court that either Plaintiff or Defendant engaged in discovery during the state court proceedings. Few similarities can be drawn between *Pahlavi* and the matter before the Court. The analysis in the *TransDulles* case, however, presents the Court with a more difficult decision. In *TransDulles*, the defendant failed to appear at a dispositive hearing during which the plaintiff presented evidence and called a witness. That situation resembles the record before the Court. The Judgment Order states that "the defendants[, including Owens,] having not answered the plaintiff's Motion for Judgment and being solemnly called came not . . . . ***And the evidence of the plaintiff being heard***, the Court entered judgment for the plaintiff against the defendant in the amount of $100,000." (Pl.'s Ex. 3; emphasis added) In *TransDulles* and in this matter, the defendants failed to appear at a dispositive hearing and the trial courts heard evidence presented by the plaintiff in the absence of the defendant. The Court, however, cannot reach the same conclusion as the *TransDulles* court.

The Court will only apply collateral estoppel when the record before it is complete. "The court called upon to determine whether the judgment is dischargeable should look to the entire record to determine the wrongful character of the act, for even the pleadings are not necessarily

19

conclusive." 4 Collier on Bankruptcy ¶ 523.12[5] (Alan N. Resnick & Henry J. Sommers eds.,

16th ed. Rev. 2010).

> [W]here no detailed findings were made in the prior proceeding, application of
> collateral estoppel could result in the entry of judgment for the party that
> prevailed in the prior proceeding, provided that: (1) the bankruptcy court can
> determine with precision from a review of the pleadings and the record what
> issues were actually litigated and determined in the prior proceeding and (2) the
> legal standards employed under state law in the prior proceeding [are] congruent
> with the standards under the applicable provision of [§ 523(a)(6)].

*Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128, 144 (Bankr. E.D. Pa. 2008).[7] Here, the Court is

unable to determine with precision that the issue of Defendant's assault and battery were actually

litigated on the basis of the record before the Court. The Court will not speculate as to what

issues may or may not have been litigated in the state court action.

The record presents only two documents from the state court proceeding: (1) Plaintiff's

Motion for Judgment; and (2) the Judgment Order. Count III of the Motion for Judgment alleges

that Owens, Bell, and Honard "unlawfully and without just cause or provocation struck with

force and arms assaulted and battered plaintiff Reed, such actions being willful and wanton and

constituting a conscious disregard of the rights of the plaintiff." (Motion for Judgment ¶ 28.)

Owens, Honard, and Bell "acted with reckless indifference to the consequences of their actions."

(Motion for Judgment ¶ 30.) The Judgment Order states that "the defendants having not

answered the plaintiff's Motion for Judgment and being solemnly called came not . . . . And the

evidence of the plaintiff being heard, the Court entered judgment for the plaintiff against the

---

[7] *Jacobs*, while issued by the Eastern District of Pennsylvania, is nonetheless instructive because this District has held previously that "Virginia's collateral estoppel law is similar in many respects to Pennsylvania law." *Schriver v. Valley Stream Fin. (In re Schriver)*, 218 B.R. 797, 804 (Bankr. E.D. Va. 1998) (noting that, post-*TransDulles*, the only significant distinction is Virginia's lack of blanket exemption from application of collateral estoppel in case of default judgment).

defendant in the amount of $100,000." (Pl.'s Ex. 3.)[8]

The Court cannot conclude on the record whether or not the issue of Defendant's alleged

assault and battery of Plaintiff was actually litigated to degree sufficient to meet the standard of

proof required by § 523(a)(6). An intentional tort sufficient to warrant a finding of

"nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or

intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 63 (1998) (emphasis in

original). The incomplete record of the state court proceedings before this Court negates a

finding that the Defendant intended to cause an injury or deliberately caused injury to the

Plaintiff. Therefore, the Court shall not apply collateral estoppel. *See also Lopez v. Bultes (In re*

*Bultes)*, Adv. No. 05-3138, 2009 WL 886884, at *6 (Bankr. D. Conn. March 26, 2009)

(declining to apply collateral estoppel in § 523(a)(6) context where debtor-defendant entered

guilty plea to criminal charge of assault and where state court civil judgment against debtor-

defendant because the plea and judgment were ambiguous as to intentional nature of assault).

## B. The § 523(a)(6) Count Is Upheld

### 1. Burden of Proof

Under Federal Rule of Bankruptcy Procedure 4005[9], the plaintiff bears the burden of

proving that a debt is nondischargeable in a bankruptcy case. It is well-settled that in the §

523(a) context "the plaintiff must prove nondischargeability by a preponderance of the

evidence." *Orts v. Brickhouse (In re Orts)*, No. 08-07075-SCS, 2009 WL 903259, at *7 (Bankr.

---

[8] The Parties submitted a Stipulation of Facts in advance of trial, and stipulated that the Judgment Order "dated
March 12, 2007 is a valid, un-appealed and as of this date un-appealable final judgment order from a court of
competent jurisdiction in the amount of $100,000.00 plus interest . . . and court costs." (APN 09-7142-FJS; Doc.
No. 17.)

[9] "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." F.R.
Bankr. P. 4005.

E.D. Va. Feb. 24, 2009) (citing *Grogan*, 498 U.S. at 287-88; *Farouki v. Emirates Bank Int'l,*

*Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir. 1988);

*Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 (Bankr. E.D. Va. 1988)); *see also*

*Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *Grogan*,

at 291); *KMK Factoring, L.L.C., Diversified Investments, L.P. v. McKnew (In re McKnew)*, 270

B.R. 593, 617 (Bankr. E.D. Va. 2001).

    "The burden of showing something by a preponderance of the evidence . . . requires the

trier of fact to believe that the existence of a fact is more probable than its nonexistence before

[he] may find in the favor of the party who has the burden to persuade the [judge] of the fact's

existence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete*

*Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622

(1993) (internal quotation marks omitted)).

> 'Preponderance of the evidence' has been defined as 'evidence which, when
> weighed with that opposed to it, has more convincing force and is more properly
> true and accurate. *[When] the evidence appears to be equally balanced*, or if it
> cannot be said upon which side it weighs heavier, *then plaintiff has not met his*
> *or her burden of proof.*'

*Orts*, 2009 WL 903259, at *7 (emphasis added) (quoting *Smith v. United States*, 726 F.2d 428,

430 (8th Cir. 1984)). Therefore, Plaintiff bears the burden of proving each of § 523(a)(6)'s

elements, and Plaintiff must prove those elements with "more convincing force" than the

evidence adduced by the Defendant. *Orts*, 2009 WL 903259, at *7 (quoting *Smith*, 726 F.2d at

430). In the event that the "evidence appears to be equally balanced," Plaintiff will have failed

to carry his burden, and his case fails as a matter of law. *Id.*

**2. Legal Standard**

    Section 523(a)(6) of the Code states that "[a] discharge under section . . . 1328(b) of this

title does not discharge an individual debtor from any debt—. . . for willful *and* malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (emphasis added).    The elements necessary for a creditor to obtain a determination of nondischargeability are: "'(1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) that the debtor's actions were malicious.'" *Ocean Equity Group, Inc. v. Wooten* (*In re Wooten*), 423 B.R. 108, 128 (Bankr. E.D. Va. 2010) (quoting *E.L. Hamm & Assocs., Inc. v. Sparrow* (*In re Sparrow*), 306 B.R. 812, 834 (Bankr. E.D. Va. 2003)) (citing *Glucona Am. Inc. v. Ardisson* (*In re Ardisson*), 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001))).

Justice Ginsburg, writing for a unanimous Court in *Geiger*, held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Geiger*, 523 U.S. at 62 (emphasis in original).    Justice Ginsburg deduced that § 523(a)(6) requires that "[i]ntentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* (quoting Restatement (Second) of Torts § 8A, Comment *a*, p. 15 (1964) (emphasis added).    The Supreme Court rejected a "more encompassing interpretation" of § 523(a)(6) that "could place within the excepted category a wide range of situations in which the act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor." *Geiger*, 523 U.S. at 63.    In order to meet this standard, the act must be intentional, and the defendant-debtor must have desired or anticipated that injury would result from the act.

The Eastern District of Virginia adheres to the "'objective substantial certainty' or 'subjective motive' test to satisfy the willfulness requirement." *Singh v. Sohail* (*In re Sohail*), Adv. No. 08-503059-KRH, 2009 WL 1851247, at *7 (Bankr. E.D. Va. June 25, 2009). (citing *Johnson v. Davis* (*In re Davis*), 262 B.R. 663, 670 (Bankr. E.D. Va. 2001)) (quoting *In re*

*Trammell*, 388 B.R. 182, 187 (Bankr. E.D. Va. 2008) (citing *Parsons v. Parks (In re Parks)*, 91

Fed. Appx. 817, 818-19 (4th Cir. 2003))). The Court must answer in the affirmative—on an

objective basis—when asked were the consequences of Defendant's actions substantially certain

to result from those actions. If, by preponderance of the evidence, Plaintiff shows that Defendant

held the subjective motive and intent that the consequences of his actions were the anticipated

result, then Plaintiff has satisfied the willfulness element.

With respect to the third element—malice—*In re Wooten* is again instructive. *In re

Wooten*, 423 B.R. at 130-33 (quoting *In re Davis*, 262 B.R. at 670-71). "What is required is that

the plaintiff prove that [the] debtor's injurious act was done deliberately, intentionally and with

knowing disregard for [the] plaintiff's rights." *In re Davis*, 262 B.R. at 670-71 (citing *First Nat'l

Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir.1995). "Malice does not mean

the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside

of bankruptcy. In bankruptcy, [the] debtor may act with malice without bearing any subjective

ill will toward plaintiff creditor or any specific intent to injure same." *In re Davis*, 262 B.R. at

670 (citing *In re Stanley*, 66 F.3d at 667; *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d

1003, 1008-09 (4th Cir. 1985)); *see also Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 309

(Bankr. N.D. Ohio) ("no ill-will, hatred or spite is required, however"); *Fisher v. Wright (In re

Wright)*, APN 08-1075, 2008 WL 2858715,at *3 (Bankr. W.D.N.Y. July 21, 2008).

**3. Discussion**

**a. The Defendant Caused Injury To The Plaintiff**

Defendant's testimony reveals that his own physical acts toward Plaintiff caused injury to

the Plaintiff. (Trial Tr. 84:12-19; 85:4-6.) Defendant admitted that he "charged at" Plaintiff

"and took him to the ground." (Trial Tr. 84:12-13.) Defendant also admitted that he hit Plaintiff

on the head, knocking Plaintiff to the ground. (Trial Tr. 84:16-19.) Defendant also testified that

he kicked Plaintiff twice causing Plaintiff to fall to the ground. (Trial Tr. 84:16-19.) Plaintiff's

own testimony corroborates these acts. (Trial Tr. 46:21-47:5.) The Parties' pre-trial Stipulation

of Facts states that Plaintiff was injured during the incident and that the medical records

submitted are "legitimate indicia of the Plaintiff's injuries, medical treatment and medical expenses."

(APN 09-07142-FJS, Doc. No. 17, Stip. of Facts at 1.)

Upon reviewing Plaintiff's medical records, the Court concludes that Plaintiff suffered

injuries as a result of the altercation with Defendant. Medical reports completed on October 22,

2002 reveal that Plaintiff suffered spinal contusions and sprains or strains and a renal contusion.

(Pl.'s Ex. 1 at 3.) The medical reports suggest injuries that may be deemed typical of a fight

outside a bar at 1:30 AM.

Defendant's physical battery of Plaintiff was a proximate cause of the injuries that

Plaintiff suffered. Defendant struck Plaintiff with his hands, kicked Plaintiff, and did so with

force sufficient to knock Plaintiff to the ground from a standing position, twice. At a minimum,

it is to be expected that the victim of such a struggle would suffer bruises and contusions.

### b. Defendant's Actions Were Willful

The evidence and testimony proves "with more convincing force" than not that

Defendant intended to injure Plaintiff. *Orts*, 2009 WL 903259, at *7 (quoting *Smith*, 726 F.2d at

430). "An injury is willful when the court can determine that the debtor intended the act and by

his or her conduct intended to cause injury." *Trammell*, 388 B.R. at 187 (citing *Geiger*, 523 U.S.

at 61). In order for the Court to conclude that Defendant intended for his contact to cause injury

to Plaintiff, by a preponderance of the evidence, the evidence in the record must demonstrate that

it is more probable than not that Defendant intended to injure Plaintiff. *See Rambo*, 521 U.S.

25

121, 137 n.9 (quoting *Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. at 622).

The Court finds Fluet's and Plaintiff's testimony credible. If finds that Defendant deliberately punched and kicked Plaintiff while Plaintiff was on the ground. After Plaintiff retaliated from the ground, Defendant struck Plaintiff on the head, knocking Plaintiff back to the ground. Defendant failed to take this clear opportunity to retreat. Plaintiff once again rose from the ground, and Defendant kicked Plaintiff twice causing Plaintiff to fall back to the ground. (Trial Tr. 85:9-10.)

The evidence in the record shows that Defendant's deliberate or intentional act led to injury and that Defendant intended to injure Plaintiff. The Court so finds as a finding of fact and conclusion of law. "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Geiger*, 523 U.S. at 63 (emphasis in original). Under this District's objective substantial certainty test, the Court concludes that the Defendant acted with intent to injure Plaintiff. *See In re Sohail*, 2009 WL 1851247, at *7. There is no other logical conclusion. Defendant repeatedly struck and kicked Plaintiff even while Plaintiff was on the ground.

Defendant's actions were beyond what can be characterized as negligence and recklessness—which fall short of willfulness. Other Courts have expounded upon this test as well. "The intent may be (1) an objective substantial certain of harm; or (2) a subjective motion to cause harm, but it must be purposeful, not simply negligent." *DiCorte v. Landrieu (In re Landrieu)*, APN 09-1044, 2010 WL 971790 (Bankr. E.D. La. Mar. 11, 2010) (citing *Madison v. Williamson*, 410 B.R. 481, 484 (S.D. Tex. 2008)) (internal footnotes omitted); *see also Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008).

This Court, not surprisingly, is not the first court to determine the willfulness of a

26

defendant-debtor's actions in a bar-fight, during which the plaintiff suffered injuries. The United

States Bankruptcy Court for the District of Kansas held in favor of a plaintiff who suffered

injuries in a bar-fight. *Reynolds v. Phillips (In re Phillips)*, APN 08-7046, 2009 WL 1941307

(Bankr. D. Kan. July 2, 2009). In *Phillips*, the defendant-debtor claimed that he acted in self-

defense when he believed that the plaintiff brandished a knife. *Id.* at *2. Disinterested witnesses

testified that no such knife was brandished and that the defendant-debtor attacked the plaintiff

from behind without warning. The defendant-debtor struck the plaintiff with a pool cue in the

head. *Id.* Notably, testimony revealed that over twenty patrons were present during this

altercation, and defendant-debtor's assertion of self-defense was held not to be credible because

those patrons could have provided some aid to the defendant-debtor yet did not to intervene. *Id.*

   In the instant matter, Defendant testified that a large crowd had gathered outside T.G.'s,

yet Defendant was the *only* person to interject himself into the altercation between Bell, Honard,

and Plaintiff. Assuming *arguendo* that Defendant is correct that a crowd had gathered, and there

is no credible evidence to support this, the fact that no other bystander was as compelled as

Defendant to attack and subdue Plaintiff is telling that Defendant's perception of the events are

inaccurate and are entitled to no deference by the Court. *Phillips* is also instructive because the

defendant-debtor continued to strike the plaintiff with the pool cue when the plaintiff was on the

ground. *Id.* "Although the Court might have been able to believe that [defendant-debtor] did not

intend to strike [plaintiff] in the head the first time, such doubt evaporated when the disinterested

witnesses testified that he hit [plaintiff] in the head a second time when [plaintiff] was already on

the floor." *Id.* at *4. That court held that this met the willfulness prong of § 523(a)(6) pursuant

to *Geiger. Id.*; *see also Fisher v. Wright (In re Wright)*, APN 08-1075, 2008 WL 2858715

(Bankr. W.D.N.Y. July 21, 2008) (granting summary judgment for plaintiff on § 523(a)(6) by

27

relying on defendant-debtor's own testimony that "punch was intentional, after the Debtor 'composed' himself after being struck")

The Court finds that Defendant's own testimony at trial proves that he acted with the intent to injure Plaintiff. As stated above, Defendant voluntarily interjected himself into an ongoing altercation between Plaintiff and Bell.[10] Defendant was not a party to this fight—nor had he ever met Plaintiff before—until he charged at Plaintiff, knocking Plaintiff to the ground. After Plaintiff retaliated from the ground, Defendant struck Plaintiff on the head, knocking Plaintiff back to the ground. Plaintiff once again rose from the ground, and Defendant kicked Plaintiff twice causing Plaintiff to fall back to the ground.

In addition to placing himself in an ill-advised situation, Defendant had a clear opportunity to retreat—from any perceived threat to Bell or himself, even if that threat was not credible—after the first time that Defendant struck Plaintiff and Plaintiff lay on the ground. Defendant did not retreat, instead he continued to press the engagement.[11] Defendant's own testimony shows that he kicked Plaintiff while Plaintiff was on the ground. Defendant clearly

---

[10] Defendant had no duty to come to the aid of Bell and Honard. "Generally, a person does not have a duty to protect another from the conduct of third persons . . . . This general rule, however, does not apply when a special relationship exists . . . between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct." Delk v. Columbia/HCA Healthcare Corp., 259 Va. 125, 132 (2000) (citing *Burdette v. Marks*, 244 Va. 309, 311 (1992); *Marshall v. Winston*, 239 Va. 315, 318 (1990); *A.H. v. Rockingham Publishing Co.*, 255 Va. 216, 220 (1998); *Dudley v. Offender Aid & Restoration*, 241 Va. 270, 276 (1991); *Fox v. Custis*, 236 Va. 69, 74 (1988); *Klingbeil Management Group Co. v. Vito*, 233 Va. 445, 447-48 (1987)). No special relationship existed between Defendant and Bell or Honard. (Trial Tr. 78:2-11.)

[11] The Commonwealth of Virginia observes a doctrine known as "excusable self-defense," wherein a "defendant, who was at some fault precipitating the difficulty, abandons the fight and retreats as far as he safely can before he attempts to repel the attack." *See Foote v. Commonwealth*, 396 S.E. 2d 851, 855 (Va. App. 1990) (citing *McCoy v. Commonwealth*, 125 Va. 771, 775-76 (1919)); *see also Connell v. Commonwealth*, 542 S.E. 2d 49, 53 (Va. App. 2001); *see also Adams v. Commonwealth*, 163 Va. 1053 (1935). A defendant who plays a role in initiating an altercation must abandon the altercation and retreat, and the defendant is justified to use force only when his adversary mounts a counter-attack. Defendant Owens, who initiated the altercation with Plaintiff, failed to retreat when presented with the chance to retreat, and Plaintiff never initiated any counter-attack. Plaintiff merely attempted to get up from the ground.

intended to injure Plaintiff and did not take advantage of opportunities to disengage. The only logical and rational conclusion that the Court can draw from Defendant's repeated and continuous assault of Plaintiff, in light of the chance to withdraw and Plaintiff's submission, is that Defendant's actions were willful and done with the intent to injure Plaintiff.

### c. Defendant's Actions Were Malicious

The evidence and testimony in the record before the Court supports a finding that Defendant's acts were "done deliberately, intentionally and with knowing disregard for [the] plaintiff's rights." *In re Davis*, 262 B.R. at 670-71 (citing *In re Stanley*, 66 F.3d at 667). The Fourth Circuit does not require that the Court find subjective hatred or ill-will. *See In re Davis*, 262 B.R. at 670 (citing *In re Stanley*, 66 F.3d at 667; *Vaughn*, 779 F.2d at 1008-09); *In re Taylor*, 322 B.R. at 309; *In re Wright*, 2008 WL 2858715, at *3. Courts do not labor over the malice requirement under § 523(a)(6), especially when the willfulness requirement has been met.

That Defendant struck and kicked Plaintiff with force to cause the injuries listed in Plaintiff's medical reports and the fact that Defendant kicked Plaintiff after Plaintiff was neutralized on the ground, as discussed above, satisfies the malicious element. *Phillips*, 2009 WL 1941307, at *4. Defendant testified that he interjected voluntarily himself into the altercation between Plaintiff and Bell and Honard. Defendant's acts of striking and kicking, repeatedly, Plaintiff demonstrate that Defendant acted with deliberation and intent and with disregard of Plaintiff's rights. Therefore, all three elements required to deem a debt nondischargeable pursuant to § 523(a)(6) of the Code are met. The debt Defendant Stephen R. Owens owes to Plaintiff David C. Reed is nondischargeable.

29

## V. CONCLUSION

While Defendant-Debtor may have obtained some satisfaction, and perhaps some recognition within his social circle, from his actions as set out above, those actions have consequences. Plaintiff was injured as the direct result of Defendant's willful and malicious acts. Based on the foregoing findings of fact and conclusions of law the Court finds that Plaintiff's request for a determination of nondischargeability of a debt pursuant to § 523(a)(6) is hereby GRANTED. A separate Order will follow.

Upon entry of this Memorandum Opinion, the Clerk of Court is directed to serve via United States Mail a copy of this Memorandum Opinion to: Stephen R. Owens, 214 Moonefield Drive, Smithfield, Virginia, 23430; Robert V. Roussos, Esq., Roussos Lassiter, Glanzer & Marcus, PLC, P.O. Box 3127, Norfolk, Virginia, 23514; David C. Reed, c/o, Thomas B. Dickenson, Esq., 1170 Lexington Avenue, Suite 203, Norfolk, Virginia, 23508; Michael P. Cotter, Esq., Chapter 13 Trustee, 870 Greenbrier Circle, Suite 402, Chesapeake, Virginia, 23320; and the Office of the United States Trustee, 200 Granby Street, Room 625, Norfolk, Virginia, 23510.

DATED:

3 -17- 2011

FRANK J. SANTORO
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
Entered on docket
MAR 1 7 2011

30